UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>      Plaintiff,<br><br>  v.<br><br>AUSTIN TELE-SERVICES PARTNERS,<br>L.P., *doing business as* GENESIS ATS,<br><br>      Defendant. | Civil Action No. A-19-CV-956<br><br>**COMPLAINT AND<br>JURY DEMAND** |

For its Complaint, Plaintiff United States of America (the "United States"), by and through its undersigned attorneys, alleges as follows:

**INTRODUCTION**

1.     This is a civil action by the United States for treble damages and civil penalties against defendant Austin Tele-Services Partners, L.P., doing business as Genesis ATS (hereinafter "ATS"), for violations of the False Claims Act, 31 U.S.C. §§ 3729–3733.

2.     Alternatively, the United States is entitled to recover from ATS under the common law doctrines of negligent misrepresentation, unjust enrichment, and payment by mistake.

3.     The United States paid ATS for computer networking and telecommunications equipment manufactured by Cisco Systems, Inc. ("Cisco").

4.     ATS represented to the United States that the Cisco products it sold included valid software licenses and warranties, and were eligible for Cisco technical support services.

5.     In fact, ATS was not an authorized reseller of Cisco products, and it delivered products to the United States that did not have valid software licenses and warranties, and that were not eligible for Cisco technical support services.

6.      ATS also falsely represented that certain used or refurbished Cisco products it sold to the United States were "new," and sold to the United States lesser value Cisco products that had been altered post-manufacture to appear as higher value products.

7.      The United States would not have purchased Cisco products from ATS had it known that the products did not have valid software licenses and warranties, were not eligible for Cisco technical support services, were used or refurbished, or had been altered post-manufacture.

8.      As a result of ATS's fraudulent claims and false statements, the Unites States has suffered monetary damages in an amount to be proven at trial.

## JURISDICTION AND VENUE

9.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1345, and 31 U.S.C. §§ 3730 and 3732.

10.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 and 31 U.S.C. § 3732 because defendant ATS can be found, resides, and transacts business in this district, and because a substantial part of the events giving rise to the claims herein occurred in this district.

## THE PARTIES

11.     Plaintiff is the United States of America.  The General Services Administration ("GSA") is an independent agency of the United States.  The Department of the Interior and Department of Defense are executive branch departments of the United States.  The United States Air Force ("Air Force"), United States Army ("Army"), and United States Navy ("Navy") are military departments within the Department of Defense.  The United States Marine Corps ("Marine Corps") is a component of the Navy.

12.     Defendant Austin Tele-Services Partners, L.P., doing business as Genesis ATS, is a Texas limited partnership located in Austin, Texas.  ATS may be served with process through its registered agent Austin Tele-Services LLC at 4209 South Industrial Drive, Suite 300, Austin, Texas 78744.  ATS provides information technology, internet protocol, and telecommunications

equipment to clients in the United States and a number of international markets.  Since July 1, 2010, ATS has been a subsidiary of Genesis Networks Enterprises, LLC of San Antonio, Texas.

## THE FALSE CLAIMS ACT

13.     The False Claims Act permits the United States to recover treble damages and civil penalties from any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval."  31 U.S.C. § 3729(a)(1)(A).

14.     The False Claims Act also permits the United States to recover treble damages and civil penalties from any person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim."  31 U.S.C. § 3729(a)(1)(B).

15.     In addition to treble damages and civil penalties, a person violating the False Claims Act is liable to the United States for the costs of any civil action.  31 U.S.C. § 3729(a)(3).

16.     The False Claims Act defines the terms "knowing" and "knowingly" to mean actual knowledge, deliberate ignorance, or reckless disregard.  A defendant is liable even when it acts without specific intent to defraud.  31 U.S.C. § 3729(b)(1).

17.     As relevant here, the False Claims Act defines the term "claim" as "any request or demand, whether under a contract or otherwise, for money or property . . . that is presented to an officer, employee, or agent of the United States."  31 U.S.C. § 3729(b)(2)(A)(i).

## FACTS

## I.     DEFENDANT'S CONTRACTS WITH CISCO

18.     Cisco is a publicly traded technology company that develops, manufactures, and sells networking and telecommunications equipment.

19.     Cisco sells its products through limited direct sales, authorized distributors, and "Channel Partners."

20.     Cisco has four major authorized distributors in the United States, who may sell Cisco products only to Cisco Channel Partners and may not purchase Cisco products from unauthorized sources.

21.     Cisco Channel Partners are permitted to resell to end users Cisco products obtained from Cisco or from one of Cisco's authorized distributors.

22.     On September 12, 2008, ATS entered into an Indirect Channel Partner Agreement with Cisco (the "Partner Agreement").

23.     Under the terms of the Partner Agreement, ATS acted as a Cisco Channel Partner and authorized reseller of Cisco products.

24.     New Cisco products sold by a Cisco Channel Partner pursuant to a Partner Agreement are eligible for Cisco SmartNet services.  SmartNet offers end users Cisco technical support 24 hours a day, access to online tools and forums, updates and upgrades, and advanced hardware replacement.

25.     Secondary market (or "gray market") Cisco products—*i.e.*, products sourced outside Cisco's authorized distribution network—are ineligible for Cisco support, including SmartNet services, absent additional inspection and re-certification performed by Cisco for a fee.

26.     New Cisco products are also sold with warranties for the benefit of the initial purchaser or end user.  The warranties are not transferrable to any other purchaser or end user unless specifically authorized by Cisco.

27.     On September 28, 2009, Cisco terminated the Partner Agreement with ATS after it discovered that ATS had sourced and sold Cisco products outside of authorized sales channels, in violation of the agreement.

28.     In November 2011, ATS and Cisco entered into a Master Sale Agreement for Used Cisco Products (the "Master Sale Agreement").

29.     Under the terms of the Master Sale Agreement, ATS acted as an authorized reseller of used Cisco products.  ATS was not permitted to represent the equipment as Cisco Certified Refurbished Equipment, nor could it sell new Cisco products.

30.     On April 3, 2014, Cisco terminated ATS's Master Sale Agreement.

## II.    DEFENDANT'S GSA SCHEDULE 70 CONTRACT

31.    During the time period relevant to this complaint, Kirk Miller was ATS's President, Jay Bock was ATS's Vice President of Sales, and Mike Rose was ATS's Senior Director of Sales.

32.    In or around January 2010, Bock and Mike Rose hired Mike Rose's brother, Bryan Rose, to assist ATS in securing business on the GSA Schedule 70 contract.

33.    Schedule 70 is an indefinite delivery / indefinite quantity multiple award schedule contract awarded by GSA to technology vendors.  Federal contracting officers are able to submit "delivery orders" or "task orders" to purchase certain technology products and services directly from vendors included on Schedule 70.  *See* 48 C.F.R. §§ 8.401–8.406; GSA, *Technology Purchasing Programs: IT Schedule 70*, https://www.gsa.gov/technology/technology-purchasing-programs/it-schedule-70.

34.    On or about May 25, 2010, GSA awarded ATS a Schedule 70 contract (Contract Number GS-35F-0451W) to provide general purpose commercial information technology equipment, software, and services.

35.    Mike Rose was listed on the Schedule 70 contracting documents as the ATS point of contact.  Bryan Rose negotiated the contract and conducted all modifications, price updates, and administrative functions.

36.    Under the terms of its Schedule 70 contract, ATS was authorized to sell certain products under Special Item Number ("SIN") 132-8, Purchase of New Equipment.  Specifically, ATS was authorized to sell new Juniper Network equipment under SIN 132-8 pursuant to the Letter of Supply it maintained with that company.

37.    ATS was *not* authorized to sell Cisco equipment under SIN 132-8.  At the time GSA awarded the Schedule 70 contract, ATS could no longer sell new Cisco products under the Partner Agreement, which had terminated in 2009.

38.    On May 25, 2011, Bryan Rose submitted a request for modification to the Schedule 70 contract to permit ATS to sell refurbished Cisco products under SIN 132-9.  Bryan

5

Rose and Mike Rose, along with another ATS employee, were listed as authorized negotiators for the contract modification.

39.     In correspondence with Mike Rose, a GSA contracting officer noted that many of the item descriptions proposed by ATS indicated that the items were "new."  The contracting officer explained that new items must be sold under SIN 132-8, that new and used items have different supply requirements, and that procurement officials would find it difficult to compare prices of new items against prices for used or refurbished items.

40.     Internally, ATS used four categories to classify its inventory: (1) "new channel" products sold directly from a supplier under a Letter of Supply; (2) "new surplus" products bought outside of authorized distribution networks; (3) "used" products sold in as-is condition; and (4) "refurbished" products, which are used but sold with a warranty.  ATS did not have a Letter of Supply with Cisco, and all Cisco equipment obtained by ATS after the termination of its Partner Agreement in 2009 fell into one of the last three categories used by ATS.

41.     Following additional correspondence with the GSA contracting officer, Bryan Rose eventually confirmed that, notwithstanding the descriptions used by ATS, all products being offered were refurbished and were not in Cisco new sealed condition.

42.     The GSA contracting officer denied ATS's modification request because it did not meet the necessary requirements for award.  However, GSA later did modify the Schedule 70 contract to permit ATS to sell certain products under SIN 132-9, Purchase of Used or Refurbished Equipment, including a number of Cisco products.

43.     Based on their discussions with the GSA contracting officer, Mike Rose and Bryan Rose understood that only genuinely "new" products could be marketed and sold using SIN 132-8.  Under the Schedule 70 contract as modified, ATS and GSA agreed that "new surplus" Cisco products must be sold as used or refurbished products under SIN 132-9.

44.     ATS's Schedule 70 contract specifically required that any used or refurbished equipment offered under SIN 132-9 be clearly identified as "used" or "refurbished" in pricing

charts, product descriptions, and responses to a federal agency's request for quote or request for information.

45.     ATS's Schedule 70 contract also required that equipment offered under either SIN 132-8 or SIN 132-9 satisfactorily perform the function for which it was intended.

46.     ATS specifically warranted that any equipment offered for sale under its Schedule 70 contract would be merchantable, free from defects in design, material and workmanship, fit and sufficient for the purposes intended by the recipient, free from all liens and encumbrances, and would strictly conform to and perform in accordance with applicable specifications, drawings, and samples.  ATS also agreed to comply with all applicable laws and regulations.

## III.     DEFENDANT'S SCHEME TO DEFRAUD THE UNITED STATES

47.     Following the award of its Schedule 70 contract, ATS represented to United States procurement officials that it was offering new Cisco products under SIN 132-8 and used or refurbished Cisco products under SIN 132-9.  ATS charged more for the purportedly "new" Cisco products offered under SIN 132-8 than it did for the used or refurbished products offered under SIN 132-9.

48.     At no time following the award of its Schedule 70 contract was ATS able to obtain and sell to the United States new Cisco products through authorized Cisco distribution channels.  Instead, to fulfill orders for purportedly "new" Cisco products, ATS turned to gray market sources, including vendors located in foreign countries.

49.     By sourcing Cisco products from the gray market, ATS was able to obtain substantial discounts and then mark up the products for its government customers while still remaining competitive with other Schedule 70 vendors.

50.     In addition, ATS employees were incentivized to use less expensive gray market products to fulfill delivery orders submitted by the United States.  ATS employees made a commission on sales between 12% and 15%, which was calculated based on the difference between the ATS purchase price and the sale price to the United States purchaser.

51.     At least one of ATS's gray market suppliers, Pantera Communications ("Pantera") of Germany, specifically asked ATS to direct its customers not to contact Cisco in the event of any problems or issues with the products sourced from Pantera.  Pantera explained that ATS's sourcing products from them could "ring Cisco's alarm bells" and asked to be informed if ATS's sales were on Cisco's "radar."

52.     Mike Rose was the member of ATS's sales force responsible for procurements by the Army and Air Force.  Bryan Rose was the member of ATS's sales force responsible for procurements by the Navy and Marine Corps.  Mike Rose and Bryan Rose reported to Jay Bock, who reported to Kirk Miller.

53.     ATS's executives and sales team members—including Kirk Miller, Jay Bock, Mike Rose, and Bryan Rose—knew, deliberately ignored, or recklessly disregarded that products obtained outside Cisco's authorized distribution channels were not eligible for SmartNet services absent additional inspection and re-certification by Cisco.

54.     ATS's executives and sales team members—including Kirk Miller, Jay Bock, Mike Rose, and Bryan Rose—were aware of Cisco's policies and its inspection and re-certification program, which would have allowed Cisco technical support services, licenses, and warranties to be applied to Cisco products sold by ATS if they were found to meet Cisco products specifications, design and standards in manufacturing.

55.     Rather than incur the costs of inspection and re-certification by Cisco, ATS's sales personnel—including Mike Rose and Bryan Rose—falsely represented to United States acquisition personnel that the company had Cisco engineers on staff who inspected and certified the Cisco products offered for sale by ATS.  In fact, ATS employees were not Cisco engineers capable of providing the inspection and re-certification required by Cisco for technical support services, licenses, and warranties.

56.     ATS's executives and sales team members—including Kirk Miller, Jay Bock, Mike Rose and Bryan Rose—also knew, deliberately ignored, or recklessly disregarded that

many "Cisco" products obtained outside Cisco's authorized distribution channels were counterfeited or altered post-manufacture.

57.     On February 28, 2008—while ATS was still a Cisco Channel Partner—the United States Department of Justice and United States Department of Homeland Security publicly announced "Operation Cisco Raider," an international initiative targeting the illegal importation and sale of counterfeit network hardware manufactured by Cisco.  The announcement specifically noted the risk of network infrastructure failure associated with such counterfeit products, most of which were imported from China.  *See* Dep't of Justice, *Departments of Justice and Homeland Security Announce International Initiative Against Traffickers in Counterfeit Network Hardware*, https://www.justice.gov/archive/opa/pr/2008/February/08_crm_150.html.

58.     And on May 6, 2010—shortly before ATS was awarded a Schedule 70 contract— the United States Department of Justice further announced that Operation Cisco Raider had resulted in 30 convictions and the seizure of counterfeit Cisco network hardware worth more than $143 million.  The announcement noted that the initiative was designed to protect the United States' computer networks and IT infrastructure from failures associated with counterfeit network hardware, including the potential for secure communications to be intercepted and the security of military personnel to be compromised.  *See* Dep't of Justice, *Departments of Justice and Homeland Security Announce 30 Convictions, More Than $143 Million in Seizures from Initiative Targeting Traffickers in Counterfeit Network Hardware*, https://www.justice.gov/opa/ pr/departments-justice-and-homeland-security-announce-30-convictions-more-143-million-seizures.

## IV.    DEFENDANT'S FALSE CLAIMS AND FALSE STATEMENTS

59.     ATS—including specifically Mike Rose and Bryan Rose—knew that ATS could not offer "new" Cisco products to the Army, Air Force, Navy, or Marine Corps under SIN 132-8, and that any Cisco products sold by ATS must be identified to federal procurement officials as "used" or "refurbished" products and offered for sale under SIN 132-9.

60.     ATS—including specifically Mike Rose and Bryan Rose—also knew that the gray market Cisco products provided by ATS were not eligible for SmartNet services absent inspection and re-certification by Cisco.

61.     Notwithstanding this knowledge, ATS—through Mike Rose and Bryan Rose— offered for sale to United States acquisition personnel purportedly "new" Cisco products under SIN 132-8, represented that these products came with SmartNet services, and charged a premium for such services under a separate line item on each invoice.

62.     In addition, ATS—through Mike Rose and Bryan Rose—offered for sale to United States acquisition personnel gray market Cisco products that were originally sold in China and had been counterfeited or altered post-manufacture to appear as higher value products.

63.     ATS executives—including Kirk Miller and Jay Bock—were aware of the company's improper sales to the U.S. government and of complaints from commercial and government customers.

64.     ATS's sales personnel—including Mike Rose and Bryan Rose—acted at the direction of these ATS executives, whose stance was to "make the sales and see what happens."

65.     Even after obtaining a Schedule 70 contract, ATS did not offer any government contracting training to its sales personnel.

### Naval Surface Warfare Center (N00244-11-F-0055)

66.     On December 10, 2010, the Naval Surface Warfare Center, a component of the Navy, submitted delivery order N00244-11-F-0055 to ATS.  The total value of the delivery order was $16,975.00.

67.     ATS invoiced the Navy $2,939.00 for SmartNet licenses for these products.

68.     Because the products were obtained outside authorized distribution channels, none of the SmartNet licenses were valid.

69.     In connection with delivery order N00244-11-F-0055, the Navy paid ATS $2,939.00 for invalid SmartNet licenses.

## Fort Leavenworth (D11PD20209)

70.     On July 1, 2011, the Department of Interior, on behalf of Fort Leavenworth, an Army installation located in Kansas, submitted delivery order D11PD20209 to ATS for 105 new WS-C3750X-48P-S switches under SIN 132-8.  The total value of the delivery order was $2,585,563.42.

71.     ATS represented that the Cisco products it was providing were "new" as defined by SIN 132-8, and it invoiced the Army $63,525.00 for SmartNet licenses for such products.

72.     Because they were obtained outside authorized distribution channels, none of the products provided by ATS were "new" as defined by SIN 132-8, and none of the SmartNet licenses were valid.

73.     On or around March 3, 2015, the Army reported to Cisco that three of the WS-C3750X-48PF-S switches had failed.  When the serial numbers provided by the Army were run through Cisco's internal system, they were flagged as potential counterfeit items.  The Army subsequently contacted Cisco regarding a number of additional WS-C3750X-48PF-S switches obtained from ATS.

74.     Based on an examination conducted by Cisco, at least six of the switches provided by ATS were of lesser value and functionality than the items ordered by the Department of Interior and listed on ATS's invoice.  These six switches were in fact model WS-C3750X-48P-L switches that had been altered to have the appearance of more expensive model WS-C3750X-48P-S switches.

75.     According to Cisco's internal sales data, the original WS-C3750X-48P-L switches that ATS attempted to pass off as WS-C3750X-48P-S switches were initially sold and shipped to entities in China at discounts ranging from 69.85% to 71.5%.

76.     In connection with delivery order D11PD20209, the Department of Interior paid ATS $37,411.74 for counterfeit WS-C3750X-48P-S switches and $63,525.00 for invalid SmartNet licenses.  The Department of Interior also paid ATS for purportedly "new" products

that were in fact used or refurbished, causing additional damages in an amount to be proven at trial.

### Hurlburt Field (FA4417-11-F-0242)

77.     On July 26, 2011, Hurlburt Field, an Air Force installation located in Florida, submitted delivery order FA4417-11-F-0242 to ATS.  The total value of the delivery order was $25,490.27.

78.     ATS invoiced the Air Force $1,885.00 for SmartNet licenses for these products.

79.     Because the products were obtained outside authorized distribution channels, none of the SmartNet licenses were valid.

80.     In connection with delivery order FA4417-11-F-0242, the Air Force paid ATS $1,885.00 for invalid SmartNet licenses.

### Vandenberg Air Force Base (FA4610-11-F-0140)

81.     On August 25, 2011, Vandenberg Air Force Base, an Air Force installation located in California, submitted delivery order FA4610-11-F-0140 to ATS for eight WS-C3750-24FS-S switches.  The total value of the delivery order was $56,184.00.

82.     ATS invoiced the Air Force $6,384.00 for SmartNet licenses for these products.

83.     Because the products were obtained outside authorized distribution channels, none of the SmartNet licenses were valid.

84.     An invoice provided to ATS by one of the third-party vendors from whom it obtained the products clearly stated the products were not being sold with licenses or relicensing / transfer of licensing.  The invoice also informed ATS that licensing was the responsibility of the purchaser and that it was at the sole discretion of Cisco whether to grant relicensing, any support, or warranty.

85.     ATS did not inform the Air Force of this information and instead charged it for SmartNet licenses that it could not provide.

86.     In connection with delivery order FA4610-11-F-0140, the Air Force paid ATS $6,384.00 for invalid SmartNet licenses.

## Special Warfare Group 4 (H92242-11-F-0179)

87.     On August 25, 2011, Special Warfare Group 4, a component of the Navy, submitted delivery order H92242-11-F-0179 to ATS.  The total value of the delivery order was $6,504.00.

88.     ATS invoiced the Navy $708.00 for SmartNet licenses for these products.

89.     Because the products were obtained outside authorized distribution channels, none of the SmartNet licenses were valid.

90.     In connection with delivery order H92242-11-F-0179, the Navy paid ATS $708.00 for invalid SmartNet licenses.

## Whiteman Air Force Base (FA4626-11-F-0084)

91.     On September 28, 2011, Whiteman Air Force Base, an Air Force installation located in Missouri, submitted delivery order FA4626-11-F-0084 to ATS.  The total value of the delivery order was $27,204.00.

92.     The delivery order was submitted in response to an ATS quote, on September 21, 2011, identifying the equipment as "NEW SEALED."  Consistent with that quote, the delivery order expressly stated that the products "cannot be refurbished."

93.     ATS represented that the Cisco products it was providing were "new" as defined by SIN 132-8, and it invoiced the Air Force $2,840.00 for SmartNet licenses for such products.

94.     Because they were obtained outside authorized distribution channels, none of the products provided by ATS were "new" as defined by SIN 132-8, and none of the SmartNet licenses were valid.

95.     In connection with delivery order FA4626-11-F-0084, the Air Force paid ATS $2,840.00 for invalid SmartNet licenses.  The Air Force also paid ATS for purportedly "new"

products that were in fact used or refurbished, causing additional damages in an amount to be proven at trial.

**Navy Facilities Engineering Command (N40192-12-F-4030)**

96.     On March 6, 2012, the Navy Facilities Engineering Command, a component of the Navy, submitted delivery order N40192-12-F-4030 to ATS.  The total value of the delivery order was $8,172.00.

97.     ATS invoiced the Navy $422.00 for SmartNet licenses for these products.

98.     Because the products were obtained outside authorized distribution channels, none of the SmartNet licenses were valid.

99.     In connection with delivery order N40192-12-F-4030, the Navy paid ATS $422.00 for invalid SmartNet licenses.

**Youngstown-Warren Air Reserve Station (FA6656-12-F-0002)**

100.     On March 19, 2012, Youngstown-Warren Air Reserve Station, an Air Force installation located in Ohio, submitted delivery order FA6656-12-F-0002 to ATS for 10 WS-C3750X-48PF-S switches and one WS-C4507R+E switch with Cisco licenses.  The total value of the delivery order was $147,898.00.

101.     ATS invoiced the Air Force $8,363.00 for SmartNet licenses for these products.

102.     Because the products were obtained outside authorized distribution channels, none of the SmartNet licenses were valid.

103.     On or around August 7, 2013, the Youngstown-Warren Air Reserve Station reported to Cisco that the WS-C3750X-48PF-S switches were not functioning after an operating system upgrade.  When the serial numbers provided by the Youngstown-Warren Air Reserve Station were run through Cisco's internal system, they were flagged as potential counterfeit items.

104.     Based on an examination conducted by Cisco, at least six of the switches provided by ATS were of lesser value and functionality than the items ordered by the Air Force and listed

on ATS's invoice.  These switches were in fact model WS-C3750X-48P-L switches that had been altered to have the appearance of more expensive model WS-C3750X-48P-S switches.

105.    According to Cisco's internal sales data, the original WS-C3750X-48P-L switches that ATS attempted to pass off as WS-C3750X-48P-S switches were initially sold and shipped to entities in China at a 75.25% discount.

106.    In connection with delivery order FA6656-12-F-0002, the Air Force paid ATS $38,310.00 for counterfeit switches and $8,363.00 for invalid SmartNet licenses.

### Space and Naval Warfare Systems Command (N00104-12-F-QB16)

107.    On May 12, 2012, the Space and Naval Warfare Systems Command, a component of the Navy, submitted delivery order N00104-12-F-QB16 to ATS.  The total value of the delivery order was $393,872.92.

108.    ATS invoiced the Navy $26,009.00 for SmartNet licenses for these products.

109.    Because the products were obtained outside authorized distribution channels, none of the SmartNet licenses were valid.

110.    In connection with delivery order N00104-12-F-QB16, the Navy paid ATS $26,009.00 for invalid SmartNet licenses.

### Navy Drug Screening Lab (N68853-12-M-DSM112)

111.    On July 19, 2012, the Navy Drug Screening Lab, a component of the Navy, submitted delivery order N68853-12-M-DSM112 for WS-C3750X-48PF-S switches to ATS. The total value of the delivery order was $42,791.94.

112.    On or around December 7, 2012, the Navy Drug Screening Lab reported to Cisco that the software for one of the switches would not boot.  When the serial number provided by the Navy Drug Screening Lab was run through Cisco's internal system, it was flagged as a potential counterfeit item.

113.    Based on an examination conducted by Cisco, at least six of the switches provided by ATS were of lesser value and functionality than the items ordered by the Navy and listed on

ATS's invoice.  These switches were in fact model WS-C3750X-48P-L switches that had been altered to have the appearance of more expensive WS-C3750X-48P-S switches.

114.    According to Cisco's internal sales data, the original WS-C3750X-48P-L switches that ATS attempted to pass off as WS-C3750X-48P-S switches were initially sold and shipped to entities in China at a 76% discount.

115.    In connection with delivery order N68853-12-M-DSM112, the Navy paid ATS $40,973.28 for counterfeit switches.

## Strategic Systems Programs (N0030-12-F-0776)

116.    On August 17, 2012, Strategic Systems Programs, a component of the Navy, submitted delivery order N00030-12-F-0776 to ATS.  The total value of the delivery order was $17,656.00.

117.    ATS invoiced the Navy $2,734.00 for SmartNet licenses for these products.

118.    Because the products were obtained outside authorized distribution channels, none of the SmartNet licenses were valid.

119.    In connection with delivery order N00030-12-F-0776, the Navy paid $2,734.00 for invalid SmartNet licenses.

## Supervisor of Shipbuilding, Conversion & Repair, Groton (N62789-12-F-0018)

120.    On August 20, 2012, the Supervisor of Shipbuilding, Conversion & Repair, Groton, a component of the Navy, submitted delivery order N62789-12-F-0018 to ATS.  The total value of the delivery order was $3,015.00.

121.    ATS invoiced the Navy $990.00 for SmartNet licenses for these products.

122.    Because the products were obtained outside authorized distribution channels, none of the SmartNet licenses were valid.

123.    In connection with delivery order N40192-12-F-4030, the Navy paid ATS $990.00 for invalid SmartNet licenses.

### NAVSAP Weapons Systems Support (N00104-12-F-QB68)

124.    On August 29, 2012, NAVSAP Weapons Systems Support, a component of the Navy, submitted delivery order N00104-12-F-QB68 to ATS.  The total value of the delivery order was $15,249.00.

125.    ATS invoiced the Navy $715.00 for SmartNet licenses for these products.

126.    Because the products were obtained outside authorized distribution channels, none of the SmartNet licenses were valid.

127.    In connection with delivery order N00104-12-F-QB68, the Navy paid ATS $715.00 for invalid SmartNet licenses.

### Gunter Annex (FA8771-12-M-1061)

128.    On September 17, 2012, Gunter Annex, an Air Force installation located in Alabama, submitted delivery order FA8771-12-M-1061 to ATS.  The total value of the delivery order was $81,983.00.

129.    ATS invoiced the Air Force $10,935.00 for SmartNet licenses for these products.

130.    Because the products were obtained outside authorized distribution channels, none of the SmartNet licenses were valid.

131.    In connection with delivery order FA8771-12-M-1061, the Air Force paid ATS $10,935.00 for invalid SmartNet licenses.

### Strategic Weapons Facility Pacific (N00406-12-F-0538)

132.    On September 18, 2012, the Strategic Weapons Facility Pacific, a component of the Navy, submitted delivery order N00406-12-F-0538 to ATS for new equipment under SIN 132-8.  The total value of the delivery order was $19,464.00.

133.    ATS represented that the Cisco products it was providing were "new" as defined by SIN 132-8, and it invoiced the Navy $1,760.00 for SmartNet licenses for such products.

134.    Because they were obtained outside authorized distribution channels, none of the products provided by ATS were "new" as defined by SIN 132-8, and none of the SmartNet licenses were valid.

135.    In connection with delivery order N00406-12-F-0538, the Navy paid ATS $1,760.00 for invalid SmartNet licenses.  The Navy also paid ATS for purportedly "new" products that were in fact used or refurbished, causing additional damages in an amount to be proven at trial.

### Space and Naval Warfare Systems Command (N66001-12-F-6490)

136.    On September 25, 2012, the Space and Naval Warfare Systems Command, a component of the Navy, submitted delivery order N66001-12-F-6490 to ATS for new equipment under SIN 132-8.  The total value of the delivery order was $57,746.00.

137.    ATS represented that the Cisco products it was providing were "new" as defined by SIN 132-8, and it invoiced the Navy $6,600.00 for SmartNet licenses for such products.

138.    Because they were obtained outside authorized distribution channels, none of the products provided by ATS were "new" as defined by SIN 132-8, and none of the SmartNet licenses were valid.

139.    Indeed, in email communications with its third-party vendor for this delivery order, ATS was told to tell its customer—the United States—that the vendor would not accept any cancellations or returns of the product and that the customer should not involve Cisco if there were any issues with the SmartNet licenses.

140.    The Navy did not pay ATS in connection with delivery order N66001-12-F-6490. The Navy canceled the order after Cisco informed it that the products were not new and did not come with valid licenses and warranties.

### Naval Criminal Investigative Service (N63285-12-F-0224)

141.     On September 27, 2012, the Naval Criminal Investigative Service, a component of the Navy, submitted delivery order N63285-12-F-0224 to ATS.  The total value of the delivery order was $26,555.00.

142.     ATS invoiced the Navy $22,310.00 for SmartNet licenses for these products.

143.     Because the products were obtained outside authorized distribution channels, none of the SmartNet licenses were valid.

144.     In connection with delivery order N63285-12-F-0224, the Navy paid ATS $22,310.00 for invalid SmartNet licenses.

### Naval Medical Research Lab (N61751-12-F-0272)

145.     On October 18, 2012, the Naval Medical Research Lab, a component of the Navy, submitted delivery order N61751-12-F-0272 for 11 WS-C3750X-48T-S switches to ATS.  The total value of the delivery order was $86,449.00.

146.     ATS invoiced the Navy $10,879.00 for SmartNet licenses for these products.

147.     Because the products were obtained outside authorized distribution channels, none of the SmartNet licenses were valid.

148.     On or around March 11, 2015, the Naval Medical Research Lab reported to Cisco that one of the switches was not functioning after a software upgrade.  When the serial number provided by the Naval Medical Research Lab was run through Cisco's internal system, it was flagged as a potential counterfeit item.

149.     Based on an examination conducted by Cisco, at least one of the switches provided by ATS was of lesser value and functionality than the items ordered by the Navy and listed on ATS's invoice.  This switch was in fact a model WS-C3750X-24T-L switch that had been altered to have the appearance of a more expensive WS-C3750X-48T-S switch.

150.     According to Cisco's internal sales data, the original WS-C3750X-24T-L switch that ATS attempted to pass off as a WS-C3750X-48T-S switch was initially sold and shipped to an entity in China at a 76% discount.

151.     In connection with delivery order N61751-12-F-0272, the Navy paid ATS $5,650 for a counterfeit switch and $10,879.00 for invalid SmartNet licenses.

### Marine Corps Institute East Contracting Department (M67001-13-F-1031)

152.     On January 16, 2013, the Marine Corps Institute East Contracting Department, a component of the Marine Corps, submitted delivery order M67001-13-F-1031 to ATS.  The total value of the delivery order was $26,610.00.

153.     ATS invoiced the Marine Corps $2,420.00 for SmartNet licenses for these products.

154.     Because the products were obtained outside authorized distribution channels, none of the SmartNet licenses were valid.

155.     In connection with delivery order M67001-13-F-1031, the Marine Corps paid ATS $2,420.00 for invalid SmartNet licenses.

### Michigan Air National Guard (W912JB-13-F-8023)

156.     On June 6, 2013, the Michigan Air National Guard, a component of the Air Force, submitted delivery order W912JB-13-F-8023 to ATS for new equipment under SIN 132-8.  The total value of the delivery order was $30,675.00.

157.     ATS represented that the Cisco products it was providing were "new" as defined by SIN 132-8, and it invoiced the Air Force $3,075.00 for SmartNet licenses for such products.

158.     Because they were obtained outside authorized distribution channels, none of the products provided by ATS were "new" as defined by SIN 132-8, and none of the SmartNet licenses were valid.

159.     At least one of the switches provided by ATS was of lesser value and functionality than the items ordered by the Air Force and listed on ATS's invoice.  This switch

was in fact a model WS-C4503-E V01 switch that had been altered to have the appearance of a more expensive model WS-C4503-E V02 switch.

160.    In addition, ATS provided two SFP transceiver modules purporting to have the model number GLC-SX-MM.  However, the serial number for the units did not meet specification for format, the build standard for the units did not meet the Fiber Optic Interconnect Technology (FOIT) build standard for model GLC-SX-MM, and the label content and format for the units did not meet specifications.

161.    In connection with delivery order W912JB-13-F-8023, the Air Force paid ATS $500.00 for a counterfeit switch, $210.00 for counterfeit transceiver modules, and $3,075.00 for invalid SmartNet licenses.  The Air Force also paid ATS for purportedly "new" products that were in fact used or refurbished, causing additional damages in an amount to be proven at trial.

### Hurlburt Field (FA4417-13-F-0077)

162.    On August 13, 2013, Hurlburt Field submitted delivery order FA4417-13-F-0077 to ATS.  The total value of the delivery order was $23,262.25.

163.    ATS invoiced the Air Force $3,300.00 for SmartNet licenses for these products.

164.    Because the products were obtained outside authorized distribution channels, none of the SmartNet licenses were valid.

165.    In connection with delivery order FA4417-13-F-0077, the Air Force paid ATS $3,300.00 for invalid SmartNet licenses.

### Naval Surface Warfare Center (N63394-13-F-5218)

166.    On October 26, 2013, the Naval Surface Warfare Center, a component of the Navy, submitted delivery order N63394-13-F-5218 to ATS.  The total value of the delivery order was $422,995.00.

167.    ATS invoiced the Navy $36,135.00 for SmartNet licenses for these products.

168.    Because the products were obtained outside authorized distribution channels, none of the SmartNet licenses were valid.

169.    The Navy terminated delivery order N63394-13-F-5218 following ATS's inability to fill the contract per the terms and conditions.  The Navy paid ATS $42,200.00 to terminate the delivery order.

## COUNT ONE
### Violation of the False Claims Act
### 31 U.S.C. § 3729(a)(1)(A)

170.    The United States re-alleges and incorporates each of the preceding paragraphs as if fully set forth herein.

171.    ATS knowingly presented for payment false or fraudulent claims to the United States in the form of invoices for Cisco products and services sold to the Air Force, Army, Navy, and Marine Corps under the GSA Schedule 70 contract.

172.    The United States would not have purchased these Cisco products and services from ATS, nor would it have paid these invoices, if it had known that, contrary to contractual requirements and ATS's representations, the products did not have valid software licenses and warranties, were not eligible for Cisco technical support services, were used or refurbished, or had been altered post-manufacture.

173.    The United States paid ATS in response to ATS's false and fraudulent claims, and suffered damages as a result.

174.    Accordingly, ATS violated the False Claims Act, 31 U.S.C. § 3729(a)(1)(A), and is liable for treble damages and penalties in an amount to be proven at trial.

## COUNT TWO
### Violation of the False Claims Act
### 31 U.S.C. § 3729(a)(1)(B)

175.    The United States re-alleges and incorporates each of the preceding paragraphs as if fully set forth herein.

176.    ATS knowingly made, used, or caused to be made or used a false record or statement material to a false or fraudulent claim.  Specifically, ATS falsely advertised for sale "new" Cisco products and SmartNet services under its GSA Schedule 70 contract, and falsely informed procurement officers that it was providing "new" Cisco products and SmartNet

services when negotiating delivery orders, despite knowing that it was not able to provide such products or services.

177.    The United States would not have purchased these Cisco products and services from ATS, nor would it have paid ATS's invoices in connection with these purchases, if it had known that, contrary to contractual requirements and ATS's representations, the products did not have valid software licenses and warranties, were not eligible for Cisco technical support services, were used or refurbished, or had been altered post-manufacture.

178.    The United States paid ATS in response to ATS's false records and statements, and suffered damages as a result.

179.    Accordingly, ATS violated the False Claims Act, 31 U.S.C. § 3729(a)(1)(B), and is liable for treble damages and penalties in an amount to be proven at trial.

## COUNT THREE
### Negligent Misrepresentation

180.    The United States re-alleges and incorporates each of the preceding paragraphs as if fully set forth herein.

181.    ATS had a duty to use reasonable care in providing information to its Air Force, Army, Navy, and Marine Corps customers or potential customers under its GSA Schedule 70 contract.

182.    ATS, in the course of its business, failed to use reasonable care in its dealings with the United States, and instead provided false information regarding the Cisco products it sold to the United States.

183.    The United States was justified in relying on the information provided by ATS.

184.    The United States suffered pecuniary loss that was proximately caused by the information provided by ATS.

## COUNT FOUR
### Unjust Enrichment

185.    The United States re-alleges and incorporates each of the preceding paragraphs as if fully set forth herein.

186.     As a consequence of the acts described above, ATS was unjustly enriched at the expense of the United States in an amount to be determined which, under the circumstances, in equity and good conscience, should be returned to the United States.

187.     The United States claims the recovery of all monies by which ATS has been unjustly enriched.

## COUNT FIVE
### Payment by Mistake

188.     The United States re-alleges and incorporates each of the preceding paragraphs as if fully set forth herein.

189.     The United States paid money to ATS based on a mistaken belief regarding the Cisco products it purchased from ATS under the GSA Schedule 70 contract.

190.     The United States would not have paid ATS for these Cisco products if the United States had not been mistaken.

## PRAYER FOR RELIEF

WHEREFORE, the United States requests judgment in its favor and against the defendant as follows:

A.     Under Counts One and Two, for three times the damages sustained by the United States under the False Claims Act, plus a civil penalty for each violation in an amount prescribed by statute;

B.     Under Counts Three, Four, and Five, for the damages sustained by the United States under the common law doctrines of negligent misrepresentation, unjust enrichment, and payment by mistake;

C.     For reasonable attorney's fees, costs, and expenses incurred by the United States in prosecuting this action;

D.     For post-judgment interest at the rates permitted by law; and

E.     For all such further relief as may be just and proper.

## JURY TRIAL DEMAND

The United States demands trial by jury as to all issues so triable.


Dated:  September 30, 2019                          Respectfully submitted,

                                                   JOHN F. BASH
                                                   United States Attorney

                                        By:        */s/ Thomas A. Parnham, Jr.*
                                                   THOMAS A. PARNHAM, JR.
                                                   Assistant United States Attorney
                                                   New York Bar No. 4775706
                                                   903 San Jacinto Blvd, Suite 334
                                                   Austin, Texas 78701
                                                   Tel: (512) 916-5858
                                                   Fax: (512) 916-5854
                                                   Email: thomas.parnham@usdoj.gov

                                                   COUNSEL FOR THE UNITED STATES

JS 44  (Rev. 06/17)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law,  except as provided by local rules of court.  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a)  PLAINTIFFS | DEFENDANTS |
|---|---|
| United States of America | Austin Tele-Services Partners, L.P., d/b/a Genesis ATS |

| **(b)**   County of Residence of First Listed Plaintiff _____ <br> *(EXCEPT IN U.S. PLAINTIFF CASES)* | County of Residence of First Listed Defendant   Travis <br> *(IN U.S. PLAINTIFF CASES ONLY)* <br> NOTE:    IN LAND CONDEMNATION CASES, USE THE LOCATION OF <br> THE TRACT OF LAND INVOLVED. |
| **(c)**   Attorneys *(Firm Name, Address, and Telephone Number)* <br> Thomas Parnham, United States Attorney's Office <br> 903 San Jacinto Blvd, Suite 334, Austin, Texas 78701 <br> Tel: (512) 916-5858, Fax: (512) 916-5854 | Attorneys *(If Known)* |

## II.  BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☒ 1   U.S. Government
    Plaintiff

☐ 2   U.S. Government
    Defendant

☐ 3   Federal Question
    *(U.S. Government Not a Party)*

☐ 4   Diversity
    *(Indicate Citizenship of Parties in Item III)*

## III.  CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV.  NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for:  Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance <br> ☐ 120 Marine <br> ☐ 130 Miller Act <br> ☐ 140 Negotiable Instrument <br> ☐ 150 Recovery of Overpayment & Enforcement of Judgment <br> ☐ 151 Medicare Act <br> ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) <br> ☐ 153 Recovery of Overpayment of Veteran's Benefits <br> ☐ 160 Stockholders' Suits <br> ☐ 190 Other Contract <br> ☐ 195 Contract Product Liability <br> ☐ 196 Franchise | **PERSONAL INJURY** <br> ☐ 310 Airplane <br> ☐ 315 Airplane Product Liability <br> ☐ 320 Assault, Libel & Slander <br> ☐ 330 Federal Employers' Liability <br> ☐ 340 Marine <br> ☐ 345 Marine Product Liability <br> ☐ 350 Motor Vehicle <br> ☐ 355 Motor Vehicle Product Liability <br> ☐ 360 Other Personal Injury <br> ☐ 362 Personal Injury - Medical Malpractice | **PERSONAL INJURY** <br> ☐ 365 Personal Injury - Product Liability <br> ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability <br> ☐ 368 Asbestos Personal Injury Product Liability <br> **PERSONAL PROPERTY** <br> ☐ 370 Other Fraud <br> ☐ 371 Truth in Lending <br> ☐ 380 Other Personal Property Damage <br> ☐ 385 Property Damage Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 <br> ☐ 690 Other | ☐ 422 Appeal 28 USC 158 <br> ☐ 423 Withdrawal 28 USC 157 <br> **PROPERTY RIGHTS** <br> ☐ 820 Copyrights <br> ☐ 830 Patent <br> ☐ 835 Patent - Abbreviated New Drug Application <br> ☐ 840 Trademark | ☒ 375 False Claims Act <br> ☐ 376 Qui Tam (31 USC 3729(a)) <br> ☐ 400 State Reapportionment <br> ☐ 410 Antitrust <br> ☐ 430 Banks and Banking <br> ☐ 450 Commerce <br> ☐ 460 Deportation <br> ☐ 470 Racketeer Influenced and Corrupt Organizations <br> ☐ 480 Consumer Credit <br> ☐ 490 Cable/Sat TV <br> ☐ 850 Securities/Commodities/ Exchange <br> ☐ 890 Other Statutory Actions <br> ☐ 891 Agricultural Acts <br> ☐ 893 Environmental Matters <br> ☐ 895 Freedom of Information Act |
| **REAL PROPERTY** <br> ☐ 210 Land Condemnation <br> ☐ 220 Foreclosure <br> ☐ 230 Rent Lease & Ejectment <br> ☐ 240 Torts to Land <br> ☐ 245 Tort Product Liability <br> ☐ 290 All Other Real Property | **CIVIL RIGHTS** <br> ☐ 440 Other Civil Rights <br> ☐ 441 Voting <br> ☐ 442 Employment <br> ☐ 443 Housing/ Accommodations <br> ☐ 445 Amer. w/Disabilities - Employment <br> ☐ 446 Amer. w/Disabilities - Other <br> ☐ 448 Education | **PRISONER PETITIONS** <br> **Habeas Corpus:** <br> ☐ 463 Alien Detainee <br> ☐ 510 Motions to Vacate Sentence <br> ☐ 530 General <br> ☐ 535 Death Penalty <br> **Other:** <br> ☐ 540 Mandamus & Other <br> ☐ 550 Civil Rights <br> ☐ 555 Prison Condition <br> ☐ 560 Civil Detainee - Conditions of Confinement | **LABOR** <br> ☐ 710 Fair Labor Standards Act <br> ☐ 720 Labor/Management Relations <br> ☐ 740 Railway Labor Act <br> ☐ 751 Family and Medical Leave Act <br> ☐ 790 Other Labor Litigation <br> ☐ 791 Employee Retirement Income Security Act <br> **IMMIGRATION** <br> ☐ 462 Naturalization Application <br> ☐ 465 Other Immigration Actions | **SOCIAL SECURITY** <br> ☐ 861 HIA (1395ff) <br> ☐ 862 Black Lung (923) <br> ☐ 863 DIWC/DIWW (405(g)) <br> ☐ 864 SSID Title XVI <br> ☐ 865 RSI (405(g)) <br> **FEDERAL TAX SUITS** <br> ☐ 870 Taxes (U.S. Plaintiff or Defendant) <br> ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 896 Arbitration <br> ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision <br> ☐ 950 Constitutionality of State Statutes |

## V.  ORIGIN *(Place an "X" in One Box Only)*

☒ 1   Original Proceeding
☐ 2   Removed from State Court
☐ 3   Remanded from Appellate Court
☐ 4   Reinstated or Reopened
☐ 5   Transferred from Another District *(specify)*
☐ 6   Multidistrict Litigation - Transfer
☐ 8   Multidistrict Litigation - Direct File

## VI.  CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
False Claims Act, 31 U.S.C. §§ 3729 - 3733

Brief description of cause:
False or Fraudulent Claims (§ 3729(a)(1)(A)); False Records or Statements (§ 3729(a)(1)(B))

## VII.  REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $ _____

CHECK YES only if demanded in complaint:

JURY DEMAND:    ☒ Yes    ☐No

## VIII.  RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE _____    DOCKET NUMBER _____

DATE
09/30/2019

SIGNATURE OF ATTORNEY OF RECORD
/s/ Thomas A. Parnham, Jr.

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court.  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed.  The attorney filing a case should complete the form as follows:

**I.(a)**    **Plaintiffs-Defendants.**  Enter names (last, first, middle initial) of plaintiff and defendant.  If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations.  If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

   **(b)**    **County of Residence.**  For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing.  In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing.  (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

   **(c)**    **Attorneys.**  Enter the firm name, address, telephone number, and attorney of record.  If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.**    **Jurisdiction.**  The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings.  Place an "X" in one of the boxes.  If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff.  (1) Jurisdiction based on 28 U.S.C. 1345 and 1348.  Suits by agencies and officers of the United States are included here.
United States defendant.  (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question.  (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States.  In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship.  (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states.  When Box 4 is checked, the citizenship of the different parties must be checked.  (See Section III below; **NOTE: federal question actions take precedence over diversity cases.**)

**III.**    **Residence (citizenship) of Principal Parties.**  This section of the JS 44 is to be completed if diversity of citizenship was indicated above.  Mark this section for each principal party.

**IV.**    **Nature of Suit.**  Place an "X" in the appropriate box.  If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable.  Click here for: Nature of Suit Code Descriptions.

**V.**    **Origin.**  Place an "X" in one of the seven boxes.
Original Proceedings.  (1) Cases which originate in the United States district courts.
Removed from State Court.  (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.
When the petition for removal is granted, check this box.
Remanded from Appellate Court.  (3) Check this box for cases remanded to the district court for further action.  Use the date of remand as the filing date.
Reinstated or Reopened.  (4) Check this box for cases reinstated or reopened in the district court.  Use the reopening date as the filing date.
Transferred from Another District.  (5) For cases transferred under Title 28 U.S.C. Section 1404(a).  Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer.  (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File.  (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.
**PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.**  Origin Code 7 was used for historical records and is no longer relevant due to changes in statue.

**VI.**    **Cause of Action.**  Report the civil statute directly related to the cause of action and give a brief description of the cause.  **Do not cite jurisdictional statutes unless diversity.**  Example: U.S. Civil Statute: 47 USC 553  Brief Description: Unauthorized reception of cable service

**VII.**    **Requested in Complaint.**  Class Action.  Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand.  In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand.  Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.**    **Related Cases.**  This section of the JS 44 is used to reference related pending cases, if any.  If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.**  Date and sign the civil cover sheet.